# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MATT B. ALLISON, as representative of a class of similarly situated persons, and on behalf of the Republic Mortgage Insurance Company and Affiliated Companies Profit Sharing Plan,<br><br>     Plaintiff,<br><br>v.<br><br>REPUBLIC MORTGAGE INSURANCE COMPANY,<br><br>     Defendant. | Case No.<br><br><br>**COMPLAINT**<br><br>**CLASS ACTION** |

## <u>NATURE OF THE ACTION</u>

1. Plaintiff, Matt B. Allison, as representative of the Class described herein, and on behalf of the Republic Mortgage Insurance Company and Affiliated Companies Profit Sharing Plan (the "Plan"), brings this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Defendant Republic Mortgage Insurance Company ("RMIC" or "Defendant"), the administrator of the Plan. Defendant failed to prudently monitor the Plan's investment in an insurance company's guaranteed interest account ("GIA"), certified false and misleading statements concerning the risk of loss to Plan participants invested in the GIA, and failed to take action to avoid a $1.3 million loss of principal in the GIA. Plaintiff brings this action

pursuant to 29 U.S.C. §§ 1109 & 1132(a)(2)-(3) to recover losses to the Plan and obtain other appropriate relief.

## JURISDICTION AND VENUE

2. Plaintiff brings this action pursuant to 29 U.S.C. §§ 1109 & 1132(a)(2)-(3), which entitles participants in an employee benefit plan to pursue a civil action on behalf of a plan to remedy violations of ERISA and to obtain monetary and appropriate equitable relief.

3. This case presents a federal question under ERISA and, therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

4. Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the Plan was administered in this District and Defendant breached its fiduciary duties in this district.

## PARTIES

### DEFENDANT

5. Defendant was the sponsor and administrator of the Plan at all relevant times, responsible for selecting and monitoring Plan investments, and in that capacity acted as the fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A)(i) and (iii) because Defendant exercised control regarding the administration and management of the Plan and the disposition of Plan assets.

2

**PLAINTIFF**

6.   Plaintiff Matt B. Allison was an employee of Defendant who participated in the Plan. All of Plaintiff's Plan account was invested in the GIA. In around January 2024, his account suffered around a 9% loss. His account was then rolled to a 401(k) plan sponsored by Defendant's former parent company (the "ORI Plan"). Plaintiff's account would be worth more today if not for Defendant's failures to monitor Plan investments, report accurate information, and take action to avoid losses to the Plan.

**THE PLAN**

7.   The Plan was a defined contribution retirement plan sponsored by RMIC. The purpose of the Plan was to provide retirement benefits to RMIC employees by allowing them to defer wages pre-tax and invest in an array of investment options.

8.   In November 2023, contributions to the Plan were discontinued due to a pending sale of Defendant. In around July of 2024, all Plan accounts were transferred to the ORI Plan.

9.   The Plan was intended to qualify as a participant-directed plan under 29 U.S.C. § 1104(c), commonly known as a "404(c) plan". Qualification for 404(c) plan status requires the plan to offer a minimum of three investment options with materially different risk and return characteristics, and which in aggregate permit the participant to achieve risk and return characteristics at any point along the risk-reward spectrum typically available for retirement plan participants. 29 C.F.R. § 2550.404c-1(b)(3)(i)(B).

Case 1:24-cv-00950-CCE-LPA   Document 1   Filed 11/15/24   Page 3 of 17

10. It is broadly understood that in order to provide a full spectrum of potential portfolios along the risk-return spectrum to participants, a plan must offer at least one capital preservation option that fully protects participants from any loss of principal, while providing current income, so long as that income can be provided without risking the participant's principal.

11. The GIA was the Plan's only capital preservation option. A prudent fiduciary selecting and monitoring the sole capital preservation option in a plan's investment lineup will avoid retaining an investment option that poses a material risk of loss of principal.

## DEFENDANT'S FAILURE TO MONITOR THE GIA OR TAKE ACTION TO PREVENT LARGE LOSSES TO THE PLAN

*The GIA*

12. The GIA was the Plan's investment option intended to preserve Plan participants' principal balances and provide a fixed rate of return.

13. The Plan's assets are heavily concentrated in the GIA, an investment typically favored by older employees nearing retirement age to whom capital preservation is a priority. For instance, on December 31, 2022, the GIA comprised over 44% of the Plan's assets. For comparison, similar investments in this investment class typically comprise approximately 7% of a plan's assets.

4

14.  The GIA was governed by a group annuity contract between the Plan and Massachusetts Mutual Life Insurance Company, which was later transferred to Empower Annuity Insurance Company.

15.  During the life the GIA contract, Plan participants were able to move their account balances between the GIA and other Plan investment options at "contract value." The contract value preserved the principal balance of Plan assets invested in the GIA, as well as all interest credited to the participants' accounts under the contract terms.

16.  The GIA contract could be terminated by the Plan with notice. The contract also would automatically terminate upon the occurrence of specified events, including a total or partial termination of the Plan or any other change to the Plan deemed to have an adverse impact on MassMutual/Empower.

17.  Upon termination, the contract value was subject to an adjustment based on the market value of the underlying investments purchased by the insurance company using the assets in the GIA. If the market value of the underlying investments dropped, the insurance company had the right to make up for these losses out of participant accounts upon termination of the contract. Additionally, because the GIA's underlying investments were almost entirely intermediate- and long-term fixed income securities, the most likely cause of such a decline in market value would be an increase in interest rates, which is generally associated with a drop in the price of the type of securities that backed the GIA.

5

*Defendant's Fiduciary Duties*

18. Under ERISA, the plan fiduciary responsible for selecting investments has an ongoing duty to monitor the investments to ensure that they remain prudent, and to remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

*Defendant's Failure to Protect the Plan*

19. Defendant is a mortgage insurance company. Like many other businesses exposed to the housing market, Defendant was crushed by the 2008 housing-driven financial crisis and never regained its prior form.

20. Defendant was an indirect subsidiary of Old Republic International Corporation ("ORI") and had shared governance and operations with ORI. Defendant's board of directors was controlled at all relevant times by senior ORI executives. Defendant's board of directors formally appointed the executive and audit committees of ORI's board to act on Defendant's behalf. Defendant also contracted with other ORI subsidiaries for shared services related to investment management, accounting, and other functions.

21. Between 2012 and 2022, ORI guided Defendant through a calculated "run-off" of the mortgage insurance business.

22. The run-off period started after Defendant terminated half of its employees and stopped writing new policies because it failed North Carolina's solvency requirements in 2011. Defendant has not written any new policies since 2011.

23. Defendant's mass layoffs in 2011 also triggered a partial termination of the Plan under ERISA regulations, resulting in an automatic market value adjustment of the GIA balances of terminated employees. Defendant was therefore well acquainted with the terms of the GIA contract and the circumstances that would give rise to a market value adjustment. Defendant should have continuously monitored the likelihood and probable direction of a second market value adjustment as the business navigated its run-off strategy.

24. During the run-off period, Defendant's diminished workforce remained in place solely to collect premiums and settle claims on in-force policies until Defendant's liabilities could be reduced to a sufficient degree to allow ORI to exit the mortgage insurance business altogether. That exit was long-planned to occur in 2023.

25. The existence, goals, and projected timeline of Defendant's run-off plan is not conjecture. An October 2013 press release by ORI stated that its ultimate goal was "[e]ffecting a full and fair exit from the mortgage insurance market for ORI and its shareholders."[1]

26. In presentations of ORI's financials during the run-offer period, ORI identified a fixed end date of the run-off period of December 31, 2022, at which time ORI intended to pursue a sale or other dissolution of Defendant's business.[2]

---

[1] https://www.prnewswire.com/news-releases/old-republic-announces-a-plan-of-recapitalization-by-its-rmicc-mortgage-guaranty-subsidiary-229084911.html.
[2] https://www.sec.gov/Archives/edgar/data/74260/000007426019000016/ori201810-k.htm.

27.  In January 2021, ORI affirmed its intent to sell Defendant or otherwise end the business after the run-off period, stating "our objective is to manage RMIC in an economically efficient and rewarding manner by: 1) selling the business to a cash buyer interested in its reactivation, or 2) holding it for a few years until nearly all of the insurance risk in force dissipates."[3]

28.  The run-off plan was successfully executed such that the threat of near-term business failure was substantially minimized during the run-off period as Defendant's balance sheet improved. Because the business stabilized, it was not imprudent to continue to hold the GIA as the run-off plan progressed.

29.  However, as the end of the run-off period neared, ORI's exit from Defendant's business loomed large, and the termination of the Plan or other change to the Plan that would trigger a market value adjustment to GIA balances became substantially likely.

30.  Defendant should have been aware of the substantial likelihood of a market value adjustment to the GIA as the end of the run-off period approached, as Defendant had shared governance and operations with ORI, who was directing Defendant's run-off and exit strategy.

31.  Defendant's fiduciary duty as the end of the run-off period approached required Defendant to monitor the risk that the Federal Reserve would raise interest rates

---

[3] https://ir.oldrepublic.com/news/news-details/2021/Old-Republic-Special-Dividend-Letter-To-The-Shareholders/default.aspx.

8

during the period that ORI anticipated selling or otherwise dissolving Defendant's remaining business. An increase in interest rates would cause a predictable decrease in the value of the underlying investments backing the GIA and a corresponding loss of principal to participants' GIA balances in the probable event that the GIA contract was terminated in connection with ORI's exit from the mortgage insurance business.

32. Had Defendant performed its duty prudently, it would have been clear to Defendant during 2021 that the risk of a negative market value adjustment to participants' GIA balances after the conclusion of the run-off period was unreasonably high. Between March and September of 2021, members of the Federal Reserve Bank ("FRB") revised their interest rate projections for 2023 from a median of 0.10% to 1.00%.[4] By December 2021, the median 2023 projection was up to 1.6%, and the 2024 median projection was 2.1%, while the current rate remained 0.10%.[5] The consensus among FRB members that interest rate hikes would be needed during the period that ORI intended to sell or otherwise dispose of Defendant's business created a substantial risk that participants' GIA balances would suffer a loss of principal at that time.

33. In light of these risks and the critical role that the GIA played in the Plan as the sole capital preservation option holding 44% of the Plan's total assets, a prudent fiduciary of the Plan would have had terminated the Plan's GIA contract by notice in

---

[4] https://www.federalreserve.gov/monetarypolicy/files/fomcprojtabl20210317.pdf; https://www.federalreserve.gov/monetarypolicy/files/fomcprojtabl20210922.pdf.
[5] https://www.federalreserve.gov/monetarypolicy/files/fomcprojtabl20211215.pdf.

9

2021 and avoided the risk of loss of principal associated with anticipated FRB interest rate hikes.

34. Defendant, however, did not terminate the Plan's GIA contract. Defendant held the GIA as the only capital preservation option in the Plan until the bitter end, when the GIA was liquidated in late 2023 after Defendant froze contributions in connection with ORI's long-anticipated sale of Defendant to a third-party. This action caused a 9% loss of principal to all GIA balances in the Plan, which was passed on to Plan participant accounts in January 2024.

35. A timely GIA exit by Defendant in 2021 would have avoided this loss, as the most substantial declines in the value of GIA portfolio assets did not occur until 2022, and there were multiple capital preservation options that Defendant could have offered as a replacement to the GIA (such as money market funds) that would not have exposed participants to the risk of a negative market value adjustment.

36. Defendant's inaction is highly culpable given its knowledge of the relevant circumstances and its misleading statements in the Plan's annual financial reports filed with the Department of Labor. ORI was aware in 2021 that interest rate hikes were coming, observing in statement to shareholders that "[t]hroughout the second half of 2021, the FRB signaled its intent to begin tightening interest rate policy."[6] This knowledge can be imputed to Defendant, who was controlled by ORI's executive team,

---

[6] https://s2.q4cdn.com/382431122/files/doc_financials/2021/ar/2021-ORI-Annual-Review_Final_05-10-22.pdf.

board committees, and investment managers. Defendant was also aware of ORI's plans to exit Defendant's business and the terms of the GIA contract concerning market value adjustments in the case of substantial changes to the Plan. Yet Defendant repeatedly certified in the Plan's annual financial reports that it "does not believe that the occurrence of any … event" that would trigger a negative market value adjustment was "probable."

37. Defendant's failure to appropriately acknowledge and take action in response to the high risk of loss to participants' GIA balances can only be explained by its lack of prudence and care in discharging its fiduciary duties to the Plan and its participants.

38. Terminating the GIA by notice in 2021 due to the probability that the Plan would be terminated in 2023 during a rising interest rate environment would not have required Defendant to commit any kind of insider trading. Defendant would merely be trading in fixed income securities of unaffiliated entities. Under these circumstances, acting to secure Plan participants' retirement accounts based upon information regarding the company's publicized exit plan from the mortgage insurance business was not only legal, but it was also something Defendant *should* have been doing.

**PLAINTIFF'S LACK OF KNOWLEDGE OF
DEFENDANT'S VIOLATIONS OF ERISA**

39. Plaintiff did not have actual knowledge of all material facts necessary to understand the Defendant breached its fiduciary duties under ERISA until after his account was assessed a 9% loss. Among other things, Plaintiff did not have actual

knowledge of the terms of the GIA contract or the market conditions bearing on the Plan's risk of loss with respect to the GIA, or the Plan's opportunity to avoid that loss. Plaintiff also does not have actual knowledge concerning Defendant's fiduciary processes and deliberations concerning the Plan. Plaintiff's allegations are based on his experience as a Plan participant, investigations of counsel, and reasonable inferences drawn from the facts available before discovery.

**PLAN-WIDE RELIEF**

40. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks recovery on behalf of the Plan pursuant to this statutory provision (in addition to relief under 29 U.S.C. § 1132(a)(3)).

41. Plaintiff seeks recovery for losses to the Plan due to Defendant's fiduciary breaches and equitable relief on behalf of the Plan as a whole.

42. Plaintiff is adequate to bring this derivative action on behalf of the Plan, and his interests are aligned with the Plan's other participants and beneficiaries. Plaintiff does not have any conflicts of interest with any participants or beneficiaries that would impair or impede his ability to pursue this action. Plaintiff has retained counsel experienced in ERISA litigation and intends to pursue this action vigorously on behalf of the Plan.

12

## CLASS ACTION ALLEGATIONS

43.  Plaintiff additionally and alternatively seeks certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

44. Plaintiff assert his claims on behalf of the Class of participants and beneficiaries of the Plan defined as follows:

> All participants in the Plan whose GIA account balances were reduced by the market value adjustment in around January 2024, and their beneficiaries of record and alternate payees.

45. Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan had around 160 participants and the GIA represented 44% of the Plan. On information and belief, there are more than 50 members of the Class.

46. Typicality:   Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff was a Plan participant and suffered losses due to Defendant's violations of ERISA. Defendant treated Plaintiff consistently with other Class members with respect to the Plan's GIA investment.

47. Adequacy:   Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class he seeks to represent, and he has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

13

48. <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.      Whether Defendant was a fiduciary with respect to the Plan;

b.      Whether Defendant prudently monitored the Plan's GIA investment and considered actions to avoid large losses to Plan participants;

c.      The proper form of equitable relief; and

d.      The proper measure of monetary relief.

49. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendant would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant.

50. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as allocation of wrongfully retained funds to participants, would be dispositive of the interests of all participants.

51. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct as

14

described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

52. Plaintiff and undersigned counsel will provide notice to the Class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

**CAUSE OF ACTION**
**COUNT I**
**29 U.S.C. § 1104(a)(1)**

53. Plaintiff incorporates the foregoing by reference.

54. Defendants acted as the fiduciary of the Plan with responsibility for overseeing the management and administration of the Plan, including monitoring, removing, and selecting investment options for the Plan.

55. Defendant failed to satisfy its duty of prudence pursuant to 29 U.S.C. § 1104(a)(1) with respect to monitoring the Plan's investment in the GIA and timely removing the GIA from the Plan, resulting in losses to the Plan and the individual accounts of Plaintiff and the members of the Class.

15

56. Plaintiff, the Plan, and the Class are entitled to monetary and equitable relief pursuant to 29 § U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3) as a result of this violation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant, and for the following relief:

A.     Certify Plaintiff's authority to seek plan-wide relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2);

B.     Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiff as class representative, and his counsel as class counsel;

C.     Declare that Defendant violated ERISA, 29 U.S.C. §§ 1104(a)(1);

D.     Order Defendant to make good to the Plan all losses resulting from their violations of ERISA;

E.     Determine a fair allocation of recovered sums to Plan participants;

F.     Appoint an independent administrator of the Plan to administer the distribution of recovered sums to Plan participants;

G.     Order that Defendant provide other appropriate equitable relief to the Plan and the Class, including removal of fiduciaries;

H.     Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

I.     Award prejudgment and post-judgment interest; and

J.     Award such other and further relief as the Court deems just and equitable.

Respectfully Submitted,

MORGAN & MORGAN, P.A.

Dated: November 15, 2024

/s/ Jean S. Martin
Jean S. Martin, NC Bar No. 25703
Marc R. Edelman, FL Bar No. 0096342*
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 559-4908
Facsimile: (813) 222-4795
jeanmartin@forthepeople.com
medelman@forthepeople.com

Charlie C. Gokey, MN Bar No. 0402225*
**ENGSTROM LEE LLC**
323 N. Washington Ave., Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
Facsimile: (612) 677-3050
cgokey@engstromlee.com

*special appearance forthcoming*

**ATTORNEYS FOR PLAINTIFF**

17